IN RE JOSÉ RUIZ DE VAL, querellado.

No. 22.—*Sometido:* Febrero 9, 1931. *Resuelto:* Marzo 28, 1932.

*C. Coll y Cuchí,* abogado del querellado; *R. A. Gómez,* Fiscal del Supremo.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Antes de contraer su tercer matrimonio, Luis Riefkohl dió a su prometida, Lucía Morales, la suma de $40,000. De esta suma $34,000 pasaron a poder de Tomás Morales, hermano de Lucía, quien hipotecó una finca para garantizar el pago de pagarés otorgados por esa cantidad. Estos paga-

rés fueron librados al portador. Con anterioridad al matrimonio, Riefkohl y Lucía Morales otorgaron un contrato notarial titulado "Escritura de Capitulaciones Matrimoniales." El objeto de este documento, conforme se hizo constar en el mismo, era identificar los bienes pertenecientes a cada uno de los futuros cónyuges. Contenía un inventario de los bienes pertenecientes a Riefkohl, ascendentes en su totalidad a poco más de $200,000. En este documento Lucía Morales manifestó no poseer bienes de clase alguna y que por tanto ella nada aportaría al matrimonio. También reconoció que los bienes inventariados pertenecían privativamente a Riefkohl, y convino en que solamente el producto de los mismos sería considerado como parte de los bienes gananciales. También se convino en que al disolverse el matrimonio el capital aportado por Riefkohl sería pagado primeramente y que el resto sería capital de gananciales, sujeto a división.

A su fallecimiento, Riefkohl dejó bienes valorados en algo más de $300,000. En un testamento designó a la Sra. Riefkohl como uno de sus albaceas. Sus herederos impugnaron la validez de la donación de $40,000 y alegaban que la finca hipotecada por Tomás Morales y la vaquería dirigida por él habían pertenecido en realidad a Riefkohl. Morales entonces otorgó una escritura en que trataba de traspasar la finca hipotecada a su hermano Francisco Javier Morales, maestro de instrucción pública. Los pagarés y la hipoteca fueron cancelados y cuatro nuevos pagarés, cada uno por la suma de $10,000, fueron otorgados por el supuesto comprador de la finca y entregados a la Sra. Riefkohl. Estos pagarés estaban expedidos también al portador y garantizados por una nueva hipoteca otorgada por dicho comprador. Los herederos de Riefkohl entonces solicitaron la remoción de la Sra. Riefkohl de su cargo de albacea, fundándose en que ella estaba ocultando o tratando de ocultar bienes pertenecientes a la sucesión.

La Sra. Riefkohl, representada por su abogado José Ruiz

de Val, alegaba que los $40,000 le pertenecían privativamente e insistió al mismo tiempo en su derecho como esposa supérstite a gozar de un usufructo y de una participación en los bienes gananciales en adición a un legado de $15,000 dejádole por testamento. Ella terminó sus relaciones con Ruiz de Val y utilizó a otros abogados. Esos letrados le manifestaron que no les gustaba el aspecto de la cuestión, que se trataba de una situación fea, y finalmente le aconsejaron que se conformara con los $40,000 y con unos $2,000 o más ya recibidos por ella a cuenta del legado. Sobre esta base se efectuó una transacción de la controversia entre la viuda y los herederos.

Un abogado de dos de los herederos, quienes no habían participado en la moción solicitando la destitución de la albacea, pero que estaban interesados en las negociaciones subsiguientes, declaró que él consideró el resultado como un arreglo magnífico, desde el punto de vista de los herederos. En un pleito instado por Ruiz de Val contra la viuda de Riefkohl en cobro de honorarios profesionales, aquél declaró que en su opinión la viuda tenía derecho a recobrar 40 o $50,000 por su participación en la herencia en adición a los $40,000 donados a ella antes de su matrimonio.

No hay duda respecto al carácter simulado de la supuesta enajenación hecha por Tomás Morales a su hermano Francisco Javier Morales. Todos los documentos notariales otorgados al tiempo de este traspaso simulado fueron redactados por Ruiz de Val. El manifiesta que Tomás Morales y la Sra. Riefkohl le consultaron acerca del supuesto traspaso, le hablaron sobre la reclamación de los herederos de Riefkohl con referencia a la verdadera pertenencia de los bienes en cuestión y le mostraron cierta documentación y correspondencia relativas a los méritos de tal reclamación; que después de examinar los documentos así sometídosle él llegó a la conclusión de que los bienes pertenecían a Morales y le aconsejó que era innecesario efectuar un traspaso, pero que Morales insistió y el testigo finalmente le dijo que los bienes

eran suyos y que él podía hacer lo que quisiera con ellos; que el testigo.le aconsejó a la Sra. Riefkohl y a Morales que no cancelaran la hipoteca y pagaré existentes pero que la Sra. Riefkohl insistió en que si la finca tenía que ser traspasada, debía otorgarse una nueva hipoteca que incluyera los intereses devengados y otras acreencias, y que el testigo creyó que nadie sería defraudado con el resultado de la supuesta transacción. En el pleito sobre honorarios de abogado Ruiz de Val también declaró que la Sra. Riefkohl y Morales acudieron a él en solicitud de opinión respecto a la prudencia de traspasar la finca para ponerla a salvo de cualquier intento por parte de la sucesión Riefkohl; que el testigo les manifestó que antes de hacer el traspaso tendría que examinar la prueba en que se basaba la reclamación de los herederos de Riefkohl; que entonces ellos trajeron un legajo de correspondencia cruzada entre Morales y Luis Riefkohl, ciertos estados de cuenta y cheques por importantes sumas de dinero que habían sido hechos efectivos; que después de un estudio cuidadoso de estos documentos el testigo llegó a la conclusión de que era innecesario hacer un traspaso de los bienes, especialmente en vista de que los pagarés librados al portador y garantizados con un gravamen sobre los bienes habían sido otorgados con el consentimiento de Riefkohl; que el testigo informó y aconsejó a Morales que el hecho de que Riefkohl fuera familia suya y le hubiera escrito acerca de la forma en que se llevó a cabo este negocio y de que le hubiera pasado estados de cuenta—lo que Riefkohl invirtió en el negocio, así como lo que éste producía, lo que según decía (Riefkohl) lo hacía en el terreno familiar, toda vez que él era su padre (¿hermano?) político—y el hecho de que Morales hubiese cambiado cheques librados por Riefkohl no significaba que Morales no fuera el dueño de la finca, ni que ésta perteneciera a los herederos de Riefkohl; y que él dijo a Morales que era innecesario hacer el traspaso, pero que Morales insistió.

Las declaraciones de la Sra. Riefkohl, de Tomás Morales,

de la Sra. Morales y de su hermano Francisco Javier Morales tienden persuasivamente a la conclusión de que al otorgar el traspaso simulado, la nueva hipoteca y los nuevos pagarés por la cantidad total de $40,000, ellos actuaron por consejo de Ruiz de Val dádoles como abogado de Tomás Morales y de la Sra. Riefkohl. La manifestación contenida en una carta escrita por Ruiz de Val al ser notificado por la Sra. Riefkohl de que sus servicios como abogado no serían necesitados por más tiempo, es suficiente para disipar cualquier duda razonable a este respecto. Esa aseveración hecha mucho antes de darse comienzo al presente recurso de *disbarment* fué un recordatorio de que Ruiz de Val había colocado a Tomás Morales y a la Sra. Riefkohl a cubierto de los supuestos derechos de los herederos de Riefkohl sobre la finca Sabana Llana. Si aconsejó y recomendó que se siguiera tal curso, o si se allanó al mismo y cooperó con sus planes en su calidad de notario, es cuestión de menor importancia. En uno u otro caso fué culpable de conducta impropia que no puede ser pasada por alto ni condonada al traerse a conocimiento de esta corte.

Poco después de efectuarse el traspaso simulado de la finca Sabana Llana, Ruiz de Val recibió de la Sra. Riefkohl la suma de $5,000 por la cual al día siguiente le expidió un recibo que lee como sigue:

"He recibido de doña Lucía Morales vda. de Riefkohl la suma de CINCO MIL DOLLARS, como honorarios en la tramitación de un asunto personal de ella relacionado con la sucesión de don Luis Riefkohl Sandoz (Q. E. P. D.) en el cual se discute por dicha Sucn. si pertenece a ésta o a la Sra. Morales la suma de TREINTA Y CUATRO MIL DOLLARS en pagarés hipotecarios sobre finca del Sr. Tomás S. Morales en Sabana Llana, Río Piedras, siendo convenido que por dicha suma me obligo a terminar este asunto en forma satisfactoria para ella o sea en el sentido que dicha suma por ser de ella quedará en su poder y que no tendrá que reintegrarla.

"En relación con este asunto, podré disponer de dicha suma en todo caso para los efectos de una transacción por cualquier vía en el expresado asunto.

"Una vez terminado este asunto en forma definitiva, me sera

devuelto el presente documento, todo lo cual firmo en Río Piedras, P. R., a 19 de enero de 1928, A. D.''

La Sra. Riefkohl declara que Ruiz de Val le manifestó que él necesitaba este dinero para efectuar un convenio de transacción próximo a celebrarse; que el dinero le fué entregado a Ruiz de Val para este fin, no en pago de sus servicios como abogado de ella; que su hermano Tomás Morales estaba en los Estados Unidos en aquel entonces y que ella no suscitó cuestión alguna acerca de la forma en que estaba redactado el recibo porque temía que cualquier protesta pudiera ofender a su abogado y perjudicar sus intereses en cuanto a los resultados que Ruiz de Val le aseguraba estaban próximos a obtenerse. Tomás Morales dice que su hermana le contó lo sucedido y le mostró el recibo a su regreso de los Estados Unidos y que no le gustó la forma en que estaba redactado el recibo pero que aconsejó a su hermana que esperara ulteriores acontecimientos antes de hacer protesta alguna.

Ruiz de Val se refiere a una supuesta cuestión relativa a ciertas partidas que pudieron quizá haber resultado en el pago de los herederos de Riefkohl de una suma que variaría de acuerdo con las circunstancias entre 1 y $4,000. Su explicación es que habría de recibir en pago de sus servicios la suma de $5,000 o la diferencia entre $5,000 y cualquier suma así pagada. En una carta fechada el 13 de marzo de 1929 la Sra. Riefkohl dice:

''Ahora bien, señor Ruiz de Val, me desagradan los pleitos y las luchas y a fin de poner término a estos asuntos estoy dispuesta a darle dos mil dollars, o sea el doble de la suma en que han sido tasados sus servicios, y así podremos dejar resuelto para siempre este asunto. Si usted acepta me devolvería $3,000 de los cinco mil que Ud. sabe le entregué para que cobrara sus honorarios, invirtiendo la mayor parte, o sea de $4,000 a $4,600 en la transacción que Ud. me dijo sería quizás conveniente llevar a cabo en el arreglo de mis asuntos con la sucesión.''

Cuando Ruiz de Val instituyó su procedimiento en cobro

de la suma de $14,000 por concepto de servicios profesiona-
les prestados por él, la Sra. Riefkohl radicó una contrade-
manda para recobrar los $5,000. El juez de distrito resol-
vió que los $5,000 habían sido entregados por la Sra. Rief-
kohl a su abogado para el fin alegado en la contrademanda
y dictó sentencia a favor de la Sra. Riefkolh por la suma
total de $5,000 y a favor de Ruiz de Val por la suma de
$2,000 como valor razonable de sus servicios. Ahora está
pendiente ante esta corte la apelación contra esa sentencia.

Cualquiera que sea el resultado de la acción a que nos
acabamos de referir, la evidencia aducida en el actual pro-
cedimiento, incluyendo el testimonio del mismo Ruiz de Val,
demuestra que cuando la señora Riefkohl puso los $5,000 en
manos de su abogado ella tuvo la idea de que por lo menos
la mayor parte de esa cantidad la destinaría él al arreglo
de la controversia pendiente con los herederos de Riefkohl.
El documento en que Ruiz de Val, al siguiente día de la en-
trega de los $5,000, acusó recibo de los mismos como hono-
rarios de abogado, llegó como una sorpresa desagradable
para su cliente. La declaración de Ruiz de Val dista mucho
de demostrar la existencia de una necesidad verdadera para
la entrega de este dinero en anticipación de un posible arre-
glo sobre condiciones que hubieran requerido el pago inme-
diato de varios miles de dólares. La evidencia en conjunto
prácticamente excluye cualquiera teoría racional en cuanto
a la existencia de tal necesidad. No estamos convencidos
más allá de una duda razonable de que Ruiz de Val, valién-
dose de una tergiversación directa de los hechos, indujo a su
cliente a desprenderse de la posesión de los $5,000. En uno
u otro caso, sin embargo, él dió a ella la impresión de que
necesitaba el dinero, o a lo menos la mayor parte del mismo,
a fin de efectuar una transacción. Entonces, después de ha-
ber adquirido la posesión del dinero con ese fin primario, él
acusó recibo del mismo como compensación de sus servicios
profesionales.

No hemos pasado por alto el penúltimo párrafo del re-

cibo. Puede admitirse que el documento es una nueva relación desde distinto ángulo de lo que pudiera ser el resultado del entendido entre Ruiz de Val y su cliente. Sin embargo, reveló con toda claridad al cliente por primera vez un aspecto de ese entendido que puede haber predominado en el pensamiento de Ruiz de Val desde el principio, pero si así fué, se había mantenido a cubierto.

Lo menos que puede decirse de la transacción en conjunto es que carece de los rasgos resaltantes, del candor, la franqueza, la integridad, la rectitud y la sinceridad de propósitos en que debe inspirarse la actitud de un abogado para con su cliente.

En marzo 1, 1928, Ruiz de Val recibió de la Sra. Riefkohl la suma de $2,000 por la cual le expidió el siguiente recibo:

"José Ruiz de Val, abogado notario, Pedro Arsuaga No. 6, Box 237, Teléfono 71, Río Piedras, P. R.—He recibido de doña Lucía Morales viuda de Riefkohl, dos mil dollars para colocárselos en primera hipoteca al uno por ciento sobre terrenos de 38 cuerdas, barrio Frailes, Guaynabo, Puerto Rico, en propiedad de don León Esquilín. Río Piedras, 1 de marzo de 1928. (Fdo.) José Ruiz de Val."

Pocos días después Ruiz de Val presentó a la Sra. Riefkohl para su firma una escritura de hipoteca que iba a ser otorgada a su favor por León Esquilín, escritura que ella suscribió como acreedora hipotecaria. La supuesta hipoteca nunca fué otorgada por León Esquilín. Sin embargo, posteriormente éste traspasó a Ruiz de Val la finca que iba a ser hipotecada.

La Sra. Riefkohl expedía y entregaba a Ruiz de Val recibos mensuales en los cuales ella acusaba recibo a León Esquilín del pago de los intereses en plazos mensuales. En junio 30 Ruiz de Val, que a la sazón se hallaba en París, dirigió a Tomás Morales una carta que contenía el siguiente párrafo:

"Para que se eviten las molestias del cobro de intereses de Esquilín, he ordenado por carta a mi cuñado Enrique García le gire a Chía el importe.

Ruiz de Val dice que al ofrecerle el dinero a Esquilín éste, quien ya era deudor de Ruiz de Val, manifestó que el contraer esta obligación adicional solamente empeoraría su situación económica y que prefería venderle a Ruiz de Val; que la Sra. Riefkohl había sabido desde el principio que el testigo interesaba comprar la finca; que el testigo había tomado los datos para redactar la propuesta escritura de hipoteca de un edicto, que aparecía en un expediente de dominio instituído por otro abogado a nombre de Esquilín; que posteriormente el testigo supo que el título no había sido inscrito en el registro de la propiedad; que en diversas ocasiones el testigo había explicado la situación a la Sra. Riefkohl; que al iniciarse las negociaciones el testigo había ofrecido un pagaré suyo y en broma había sugerido los nombres de Cautiño o de don Manuel González como fiadores y la respuesta fué "Su garantía me basta, Ruiz de Val, déselo y usted me responde"; que la Sra. Riefkohl sabía que el testigo era solvente; que el testigo tenía $50,000 invertidos en cierta finca en Río Piedras que estaba exenta de cargas; que el testigo también era dueño de 200 cuerdas de terreno y su crédito en el banco era bueno; que la Sra. Morales tenía conocimiento de estas fincas y sabía que un simple recibo o un pagaré suscrito por el testigo era mejor garantía que 37 o 38 cuerdas de terreno; que luego cuando Esquilín enfermó gravemente, él otorgó o reconoció ante un notario cierto documento; que desde el principio había sido entendido prácticamente entre el testigo y la Sra. Riefkohl que era la intención del testigo adquirir la finca y que el dinero le fué entregado al testigo a fin de facilitarle tal compra; que el testigo pagó los intereses por medio de cheques desde el primer plazo y tomó recibos a nombre de Esquilín; que la Sra. Riefkohl sabía que la hipoteca nunca había sido otorgada; que en una ocasión al quejarse ella de que otros deudores dejaron de cumplir sus obligaciones y al mencionar la necesidad que tenía de dinero, el testigo le manifestó que los $2,000 estaban a su disposición, asegurándole que él, de ser

necesario, podía obtener el dinero en cualquiera otra parte a un tipo más bajo; que esto ocurría en septiembre, después de haber regresado el testigo del extranjero; que algunos meses después, al romperse las relaciones y al exigírsele la devolución de los $5,000, Tomás Morales recordó al testigo que él, Morales, tenía el recibo de Esquilín y podía utilizarlo en cualquier momento para hacer aparecer que el dinero debió haber sido garantizado con una hipoteca; y que el testigo le contestó a Morales que podían hacer lo que les viniera en ganas.

Ruiz de Val dice también que le prestó el dinero a Esquilín en el mes de marzo, antes de zarpar en mayo; que se otorgó un documento provisional, un pagaré garantizado con cierta garantía colateral; y que este documento fué suscrito ante el notario Ramón Rodríguez Flores. Entonces se presentó como prueba un certificado. Este lee así:

"Por el presente CERTIFICO: Que en el libro de Registro de Affidavits a mi cargo existe la siguiente declaración: Affidavit No. 6310.—SEIS MIL TRESCIENTOS DIEZ.—Río Piedras, Julio 17 de 1929. —(6310) Leon Esquilín, mayor de edad, viudo, propietario y vecino de Río Piedras, reconoce y ratifica su firma hecha en un documento de liquidación de cuentas y compra de fecha 3 de abril de 1928, cuyo documento de liquidación se relaciona con el señor José Ruiz de Val, que es mayor de edad, casado con Amalia García Ubarri, propietario y abogado, de la misma vecindad, en cuyo documento consta que le cede una finca rústica radicada en el barrio de Monacillos de Río Piedras (conocido también, el barrio en parte donde está, la finca) por Los Frailes de 38.50 cuerdas, más o menos, en lindes por el norte con José Ruiz de Val; por el sur con Isabel Milian y; Sucesores Laborda éste con Hernáiz, Alegría y Sucesión de Pérez Hermanos; y por el oeste con José Ruiz de Val y Gervasio Solís—Río Piedras, Puerto Rico, a 12 de diciembre de 1930.—(Fdo.) Ramón H. Rodríguez Flores, notario público de Puerto Rico. (Sello del notario)"

El pagaré, de haber sido otorgado por Esquilín y de estar insoluto, o el documento a que hace referencia el notario como liquidación de cuenta y compraventa, hubiera venido mucho más al caso. En la repregunta Ruiz de Val explica,

sin embargo, que en el momento de efectuarse la liquidación de cuenta y compraventa, a Esquilín no le era posible entregar la posesión de la finca debido a ciertas cosechas en estado de crecimiento, una de las cuales era caña de azúcar, y que se convino en que Esquilín pagaría los intereses sobre los $2,000 por concepto de renta, durante la zafra en curso.

De acuerdo con la Sra. Riefkohl y con Tomás Morales, Ruiz de Val no reveló el hecho de que nunca se otorgara la hipoteca hasta casi un año después de haberse llevado a cabo la negociación. Ellos dicen que le anticiparon dinero para sellos de rentas internas e inquirían frecuentemente con el objeto de obtener copia de la escritura de hipoteca; Ruiz de Val les aplazó dándole varias excusas y que en distintas ocasiones les manifestó que el documento había sido presentado en el registro. La Sra. Riefkohl dice que él finalmente admitió que había retenido el dinero y que ofreció a ella un pagaré por el importe. Ruiz de Val no dice que él entregara los $2,000 a Esquilín sin prueba documental de tal entrega, ni es del todo probable que él lo hiciera así. Si Esquilín en realidad recibió el dinero, debió haberse presentado prueba documental de ese hecho, o de lo contrario debió haberse explicado el no haberse presentado la misma. La situación en que Ruiz de Val fué colocado por el testimonio de la Sra. Riefkohl y de Tomás Morales, corroborado en parte por el recibo de marzo 1, 1928, por el documento preparado y sometido a la Sra. Riefkohl para su firma y por la carta escrita en París exigen algo más que una certificación notarial respecto a la existencia de una liquidación de cuentas entre Esquilín y Ruiz de Val en apoyo de la declaración de este último.

No tenemos motivo alguno para dudar que Ruiz de Val fuera económicamente responsable y que los $2,000 estuvieran tan seguros en su poder como lo hubiesen estado de ser garantizados por una hipoteca sobre la finca de Esquilín.

Probablemente la Sra. Riefkohl hubiese estado bastante conforme con aceptar un pagaré de Ruiz de Val en vez de

una hipoteca, de habérsele hecho la oferta (según dice él le hizo) en marzo o abril de 1928, acompañada de una franca revelación del nuevo arreglo y de la liquidación efectuada con Esquilín, en vez de hacerlo, según dice la Sra. Riefkohl, casi un año después. No hubo intención por parte del abogado de defraudar a su cliente. Sin embargo, no debió haberla engañado al ocultarle el giro que las negociaciones de él con Esquilín habían tomado y al dejarla bajo la impresión de que la hipoteca había sido otorgada en la forma en que originalmente se había acordado. La naturaleza de las relaciones existentes entre abogado y cliente es tal que un engaño por parte del abogado a su cliente no puede ser excusado por el motivo de que no fuera probable una pérdida pecuniaria para la cliente o de que en realidad resultara de tal engaño.

*Debido a su conducta impropia en conexión con las tres cuestiones discutidas anteriormente, se suspende a Ruiz de Val del ejercicio de su profesión de abogado y notario por un período de dos años.*